Patricia SHUMWAY, Plaintiff–Appellant,

v.

UNITED PARCEL SERVICE, INC., Defendant–Appellee.

No. 969, Docket 96–7911.

United States Court of Appeals, Second Circuit.

Argued March 3, 1997.

Decided June 13, 1997.

Bonnie Strunk, Seidenberg and Strunk, Syracuse, NY, for Plaintiff–Appellant.

Stephen J. Vollmer, Bond, Schoeneck & King, LLP, Syracuse, NY, for Defendant-Appellee.

Before: WALKER, McLAUGHLIN, Circuit Judges, and CHIN, District Judge.*

McLAUGHLIN, Circuit Judge:

Plaintiff appeals from an order of the United States District Court for the Northern District of New York (Scullin, *J.*) granting Defendant's motion for summary judgment. The district court concluded that Plaintiff could not make out a prima facie case of sex discrimination and dismissed the complaint. We agree and, therefore, affirm.

### BACKGROUND

In June 1975, United Parcel Service, Inc. ("UPS") hired Patricia Shumway as a key punch operator in its Syracuse, New York facility. In 1988, UPS promoted Shumway to a first-line supervisor. Thereafter, she held several first-line supervisory positions

* The Honorable Denny Chin of the United States District Court for the Southern District of New York, sitting by designation.

until she resigned, purportedly involuntarily, from UPS in August 1991.

At the time of Shumway's 1988 promotion, she had to attend a supervisory training course in Rochester. At that course, UPS stressed its vigorous and long-standing policy against sexual harassment. Particularly emphasized was the "no fraternization" rule, prohibiting supervisors and managers from dating hourly employees. Shumway admits that the "no fraternization" policy, which is contained in UPS's widely distributed "Impartial Employment and Promotion Guide," was a "major question" at the supervisory training course.

In August 1991, Mark Besaw, an hourly employee, asked Gregory McGraw, the manager in charge of Besaw's unit, to come to his home to discuss a serious matter that Besaw did not feel comfortable discussing at work. At that meeting, Besaw confessed that he and Shumway had been dating for quite some time, but contended that their relationship had recently ended. Besaw believed, however, that Patricia Shumway was having difficulty accepting that fact. Besaw complained that twice within the prior week Shumway had been waiting at his house when he arrived home from work. Both times, Shumway became upset over the breakup, and one night she created a disturbance into the early morning hours. Besaw told McGraw about his problem with Shumway, because he feared it would negatively affect his work.

McGraw, who had been a manager at UPS for fifteen years, had handled several complaints about infractions of the "no fraternization" rule. At the time of Besaw's complaint, however, McGraw had only recently come to the Syracuse facility and this was his first experience with such a situation at his new location.

McGraw arranged to meet with Shumway to discuss the matter. At that meeting, Shumway acknowledged that she knew about the Company's "no fraternization" policy. She admitted that she had reviewed the rule several times since becoming a supervisor and that another manager had recently reminded her of the policy because rumors of her relationship with Besaw were afloat. At

the meeting, McGraw asked Shumway point blank whether she had a relationship with Besaw and she first denied it. Later in the meeting, however, she admitted that she had previously dated Besaw, claiming that it had ended eighteen months earlier. When McGraw brought up the alleged incidents at Besaw's house, Shumway at first denied being at Besaw's house, but later admitted that she had been there and had indeed argued with him over their breakup. Finally, Shumway confessed the full extent of her relationship with Mark Besaw and acknowledged that her conduct violated the Company's "no fraternization" rule.

At that point, McGraw brought Jerome Johnson, a Human Resources Manager at UPS, into the meeting. McGraw filled him in on what had so far transpired at the meeting and Johnson asked Shumway whether McGraw's version of the facts was accurate. She agreed that it was. Johnson then advised Shumway that she had violated UPS's "no fraternization" policy, and that, although no decision about her continued employment with UPS had been made, her flagrant disregard of the rule and her attempt to conceal her misconduct were serious matters. Both managers emphasized that Shumway should have come forward instead of lying about the relationship. Johnson also informed Shumway that the matter would be submitted to the district manager for a decision about what discipline, if any, her conduct warranted. Both Johnson and McGraw suggested to Shumway that she consider resigning, because a resignation would look better on her record than a termination. According to Shumway, McGraw also made it clear that if Shumway refused to resign as suggested, he would fire her. By the end of the meeting, Shumway agreed to resign, and before departing she signed an acknowledgment of her voluntary separation from the Company.

McGraw handled Besaw's complaint the same way he had handled similar complaints at UPS in Syracuse and elsewhere. Between April 1991, when he arrived at the Syracuse facility, and October 1995, when he was transferred to another UPS facility, McGraw handled two complaints of violations of UPS's "no fraternization" policy. One case involved

Shumway. The other case involved Robert Miller, a manager at UPS's facility in Ithaca, New York. In July 1992, McGraw learned that Miller was dating an hourly employee. When McGraw interviewed Miller, he admitted the affair and resigned two weeks later.

While working at other UPS facilities, McGraw also consistently enforced the "no fraternization" rule. In each case, McGraw investigated the allegations by interviewing the alleged offender. If the investigation revealed that the supervisor had violated the rule, McGraw gave that supervisor the opportunity to resign. If the supervisor did not resign, McGraw referred the matter to the district manager for a decision. In every case of infractions of the "no fraternization" rule in which McGraw was involved, the offending supervisor either voluntarily resigned or was terminated. In all these cases, except Shumway's, the offending supervisor was a man.

In April 1993, Shumway filed a complaint against UPS and three of its managerial employees in the United States District Court for the Northern District of New York (Scullin, *J.*) alleging that the defendants illegally terminated her employment on the basis of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and § 296 of the New York Executive Law. The crux of Shumway's argument was that she was terminated for violating the "no fraternization" policy while male supervisory employees who violated the same policy were not terminated. After an order (not under review) dismissing the complaint against the three individual defendants and dismissing Shumway's claim under the New York Executive Law § 296, Shumway was left with only the Title VII sex discrimination claim against UPS. UPS then moved for summary judgment and the district court granted UPS's motion based on the erroneous belief that Shumway had failed to file a statement of facts creating a genuine issue of material fact, pursuant to Rule 7.1(f) of the Local Rules of the United States District Court for the Northern District of New York. Because the court believed Shumway had failed to file the required statement, it accepted as true UPS's assertion that Shumway had resigned of her own accord, and therefore, could not demonstrate she had been discharged, a necessary element of a prima facie case of sex discrimination.

Shumway now appeals arguing that summary judgment was improper.

## DISCUSSION

■ On appeal from a grant of summary judgment, this Court reviews the record *de novo* to determine whether there are any genuine issues of material fact and whether the movant is entitled to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 716 (2d Cir.1994); *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993).

■ In a Title VII case the burden is on the plaintiff to establish a prima facie case of discrimination. *See Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir.1997). And to do this, the plaintiff must show that: (1) she is a woman; (2) she was qualified for her position; (3) she was discharged; and (4) her firing occurred under circumstances giving rise to an inference of discrimination. *See id.; see also Montana v. First Fed. S & L of Rochester,* 869 F.2d 100, 106 (2d Cir.1989). This last element of a prima facie case may be proven by showing that a man similarly situated was treated differently. *See Montana,* 869 F.2d at 106–07. Once a plaintiff alleges a prima facie case of sex discrimination, the burden of production then shifts to the employer, who must offer a legitimate, nondiscriminatory reason for its actions. *See Luciano,* 110 F.3d at 215; *Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir.1994) (ADEA case). If the employer successfully articulates such a reason, the plaintiff has the burden of proving that the proffered reason is merely a pretext for discrimination. *Id.*

■ It is beyond cavil that an appellate court may affirm the judgment of the district court on any ground appearing in the record. *See Frankel v. Slotkin,* 984 F.2d 1328, 1334 (2d Cir.1993); *University Club v. City of New York,* 842 F.2d 37, 39 (2d Cir.1988). Thus, we may affirm the grant of summary judgment on grounds different from those relied on by the court below. *See Boston*

*and Maine Corp. v. Chicago, Burlington & Quincy R.R. Co.,* 381 F.2d 365, 366 (2d Cir. 1967) (per curiam).

In Shumway's case, the district court granted summary judgment for plaintiff's failure to allege a prima facie case of discrimination because the record indicated that Shumway resigned and therefore, was not discharged, as required. UPS admits that the district court erred when it determined that Shumway had not submitted a statement asserting that genuine issues of material fact existed. Shumway did in fact submit such a statement, and it did allege that Shumway did not voluntarily resign but was forced to resign, thereby alleging a constructive discharge for purposes of a Title VII prima facie case.

Despite this error on the part of the district court, the grant of summary judgment should be affirmed. UPS concedes that Shumway satisfied the first two elements of a prima facie case—she is a woman and she was qualified for her job. For purposes of this appeal, we will assume that Shumway did not voluntarily resign and therefore, satisfied the discharge element of a prima facie case under Title VII. Assuming all of this, we conclude that Shumway failed to allege facts sufficient to support the last element of a prima facie case—that similarly situated males were treated differently.

 Shumway argued in opposition to UPS's summary judgment motion that "numerous male supervisory employees violated the [no fraternization] policy . . . and no disciplinary action was taken against these employees." *Affidavit of Patricia Shumway.* These allegations are insufficient. To establish the fourth element of a prima facie case, Shumway must show that she was treated differently from "similarly situated" males. *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992). To be "similarly situated," the individuals with whom Shumway attempts to compare herself must be similarly situated in all material respects. *Mitchell,* 964 F.2d at 583.

Shumway's allegations do not meet this standard. None of the individuals Shumway claims violated the "no fraternization" policy were supervised by Gregory McGraw or Je-

rome Johnson. McGraw, who was principally in charge of enforcing the "no fraternization" policy in his division, was not even at the Syracuse facility until April 1, 1991, just four and a half months before Shumway resigned. The uncontradicted evidence indicates that before arriving at the Syracuse facility, McGraw handled several situations involving violations of the "no fraternization" policy. All these other cases involved male supervisors. Each case was handled exactly as Shumway's was, and in each case, the supervisor either resigned or was terminated. While stationed in Syracuse, McGraw became aware of only one other fraternization situation. In July 1992, Robert Miller, a manager at UPS's Ithaca Center, was alleged to be dating an hourly employee. When McGraw interviewed Miller, he admitted his misconduct and resigned. Shumway, therefore, alleges no facts to demonstrate that male employees supervised by Gregory McGraw or Jerome Johnson were treated differently.

Shumway also does not allege that any other employees she claims violated the "no fraternization" rule engaged in the same misconduct as she. She does not present any evidence that any of the other alleged offending employees dated an hourly employee for over two years, were warned by a manager that such conduct violated Company policy, harassed that hourly employee when the relationship soured, had a complaint regarding his conduct brought against him and then lied about the misconduct when confronted. To demonstrate that similarly situated males were treated differently, Shumway has to show that these males engaged in comparable conduct. In Shumway's case, her misconduct included a long term relationship, harassing behavior and lying.

To make matters worse, Shumway admits that in most of the cases she cites she has no personal knowledge of the alleged violations but heard about them because they were "common knowledge." Shumway also admits that she never reported any of these alleged violations, nor does she have any knowledge of anyone else reporting these incidents. It is impossible to demonstrate that UPS treated similarly situated males differently when

there is no evidence that UPS knew about any other violations of the "no fraternization" rule.

■ Shumway's allegations, generously construed, are little more than conclusory statements of no probative value. She claims, for example, that "from 1975 to 1991, numerous male supervisory employees violated the policy by fraternizing with female clerical employees," and that "despite this prohibition numerous male managers and supervisors violated this policy and no disciplinary action was taken against these employees." Such sweeping allegations unsupported by admissible evidence do not raise a genuine issue of material fact. *See Union Ins. Soc'y of Canton, Ltd. v. William Gluckin & Co.*, 353 F.2d 946, 952 (2d Cir.1965).

■ Finally, even if we were to assume that Shumway could show a prima facie case of sexual discrimination, UPS has offered a legitimate, nondiscriminatory reason for terminating Shumway's employment. Shumway admits that she was aware of the "no fraternization" policy; that the policy was emphasized at the supervisory training course; that she had been warned about the policy by another supervisor who had heard rumors of her relationship with Besaw; and that she initially lied to McGraw. Shumway acknowledges, as she must, that despite her knowledge of UPS's policy regarding fraternization, she flagrantly violated it.

In response to this legitimate nondiscriminatory reason for firing her, Shumway does not present evidence "to demonstrate that [UPS's] articulated reason for its decision is in fact a pretext for discrimination." *Luciano*, 110 F.3d at 215.

## CONCLUSION

We have considered all of Shumway's additional arguments and find them to be without merit. The judgment of the district court is affirmed.