Dr. Mary RICHARDSON, Plaintiff,

v.

NEWBURGH ENLARGED CITY SCHOOL DISTRICT, Defendant.

No. 94 CIV. 7797(WCC).

United States District Court, S.D. New York.

Nov. 12, 1997.

Law Offices of Michael H. Sussman (Michael H. Sussman, Stephen Bergstein, Ambrose W. Wotorson, of counsel), Goshen, NY, for Plaintiff.

Shaw & Perelson, LLP (Mark C. Rushfield, of counsel), Poughkeepsie, NY, for Defendant.

**OPINION AND ORDER**

WILLIAM C. CONNER, Senior District Judge.

This action arises out of plaintiff's resignation from her position as a high school English teacher at the Newburgh Free Academy. Plaintiff, Dr. Mary Richardson, claims that defendant, the Newburgh Enlarged City

School District (the "District"), forced her to resign because she is African–American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the New York State Human Rights Law, N.Y. Exec. Law § 296. In addition, Richardson claims that the District permitted the disclosure of confidential material concerning her in breach of her contractual rights and in violation of her common law privacy rights.

The District now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed below, the District's motion is granted and the complaint is dismissed in its entirety.

## BACKGROUND

In the fall of 1991, after the school year had begun, a part-time teaching position opened up in the English Department of the Newburgh Free Academy ("NFA"). Upon learning of this vacancy, the District's Superintendent of Schools, Dr. Phillip Leahy, recommended Richardson for the position. At Leahy's urging, Richardson interviewed with Michael Mattausch, the District's Director of Language Arts, and Ronald Shapiro, NFA's principal at the time. Both Mattausch and Shapiro recommended her hiring to Leahy, who in turn recommended Richardson to the District's Board of Education. On October 30, 1991, the Board approved Richardson's appointment, effective September 30, 1991.

At the conclusion of the 1991–1992 school year, Richardson's part-time position was eliminated. However, Leahy, Mattausch and Shapiro determined that an additional, full-time position for an Advanced Placement English teacher needed to be created at NFA. Impressed with Richardson's employment background—in particular, her twenty years of experience as an AP English teacher in the Albany school system, her background in curriculum development, and her experience as an AP English examination developer—Leahy and Shapiro decided that Richardson was ideally suited for the new position.[1]

Accordingly, even before the job opening was posted, Shapiro wrote a letter to the Board recommending Richardson for the position. When the job description was posted on July 29, 1992 (the day after Shapiro's written recommendation), the desired qualifications—previous experience in AP English and curriculum development—squarely matched those of Richardson. On July 30, Richardson applied for the position and was promptly hired as a probationary, full-time English teacher, effective September 1, 1992.

Richardson's hiring was in spite of the District's collective bargaining agreement with the Newburgh Teachers Association (the "NTA"), which provided that "[s]eniority in the District shall be a significant factor in filling open positions." (Collective Bargaining Agreement, Art. VIII § B.3, attached as Exh. A to Mattausch Aff.) As a result of this provision, Richardson was the first person in over twenty years to be hired into the NFA English Department without prior full-time teaching experience in the District.

In her first year at NFA, Richardson was given coveted assignments despite her probationary status. She taught two high-level courses, AP English and Multicultural Literature. She was appointed to serve on curriculum-revision committees and on the District's Minority Recruitment Committee, and was approved to attend several conferences. Richardson received favorable annual reviews from Director Mattausch.

On May 7, 1993, three days before the AP English examination, Richardson distributed to her AP English students several unreleased examination questions. Richardson obtained these "live" questions while employed as a test developer by Educational Testing Service ("ETS"), a company that prepares the AP English examination for administration by the College Board. At some point during her employment at ETS, Richardson photocopied portions of the draft examinations. Although Richardson contends that she was permitted to copy these materials in order to work at home, her retention of "live" materials after her em-

---

1. Although Mattausch states that the new position "was virtually tailored by Principal Shapiro and me to be assigned to [Richardson]," (Mattausch Aff. ¶ 12), Richardson contends that "Mattausch was not pleased with Shapiro's recommendation that I be hired" (P1.Aff.¶ 5).

ployment with ETS ended was a clear violation of her ETS Employee Agreement.

As it turned out, the ETS materials that Richardson distributed to her students appeared on the May 10, 1993 AP English examination. Shortly after the May 10 exam, NFA's other AP English teacher, Katherine Denman, was informed by some of her students that Richardson's AP English students had received an advantage on the exam because Richardson had given them materials that appeared on the exam. One of Richardson's students, Richard Sanders, Jr., showed Denman the ETS materials that Richardson had given him. Denman did not recognize the materials as those released by the College Board for public use, and notified Director Mattausch.

Mattausch confirmed with ETS that only three AP English exams had been released and that other exams were not released because their passages or questions could reappear on later exams. Mattausch, Principal Shapiro, and Vice–Principal Thomas Fogarty decided to randomly select three students from Denman's class (without her knowledge) and have them review the materials obtained from Sanders. Each student individually identified the same passages and questions from these materials as having appeared on the May 10 exam. At that point, the District Administration Offices were notified of the problem.

On June 14, Richardson was summoned to meet with several school officials—Superintendent Leahy, Assistant Superintendent William Swart, then-Assistant (now Associate) Superintendent Vincent Hamlin, Deputy Superintendent Pizzo, Vice–Principal Fogarty, and Director Mattausch. The president of the NTA, Frank Colone, attended the meeting with Richardson. Richardson acknowledged that she had distributed the materials at issue to her students twice, once in the fall and once three days before the May 10 exam. Although Richardson was unable

to explain clearly how she could have handed out "live" examination material—she apparently did not even mention her access to such materials as an ETS employee—she steadfastly denied that this security breach was intentional.[2]

Following this meeting, the District notified ETS of the incident. Eventually, the three students from Richardson's AP English class who had taken the May 10 exam, including Richard Sanders, Jr., were given the choice of either retaking the compromised portion of the exam, receiving a pro rata score excluding that portion, or canceling the exam altogether.

By mid-July, after several communications with ETS, Mattausch and Fogarty recommended to Superintendent Leahy that Richardson be terminated from her probationary position. Leahy took up the issue with District administrators Swart, Hamlin, and Pizzo. They unanimously agreed that whether or not Richardson actually knew that the materials she distributed to her class might be on the May 10 exam, she exhibited poor judgment in retaining the materials and in distributing them without checking to see whether the passages and questions appeared on released exams.

Leahy then notified Richardson in a September 2 letter that the District's Board of Education would be meeting on October 5 to consider his recommendation that she be terminated. By letter dated September 10, Richardson requested the reasons for Leahy's recommendation. In a response dated September 29, Leahy wrote:

My reasons are based upon consideration of extremely poor judgment exhibited by you when you revealed questions to Advanced Placement English students at the Newburgh Free Academy which comprised part of the Educational Testing Service's 1993 AP English examination.

---

**2.** In her motion papers, Richardson repeatedly notes that ETS concluded that her distribution of the unreleased materials was "inadvertent." (Letter from ETS general counsel to District attorney, dated Sept. 20, 1993, attached as Exh. 13 to Wotorson Aff.) Although the District argues that this conclusion was not the product of any

pointed investigation, it nonetheless does not, contend that the disclosure was in fact intentional and states that its actions were taken without regard to whether or not Richardson intentionally disclosed the material. For purposes of this motion, then, the inadvertence issue is irrelevant.

While we understand that you obtained the questions when working as an employee of ETS, that did not excuse your use of the questions with NFA students without first ascertaining the propriety of the use of those questions through your supervisors. The end result was a significant educational hardship to several NFA students.

(Leahy Aff. Exh. U.) Leahy invited Richardson to submit a written response to his September 29 letter and assured Richardson that the Board would consider her response. Richardson did not respond to Leahy's letter.

Even before receiving Leahy's explanatory letter, Richardson submitted a resignation letter to Leahy dated September 28 in which she complained of a "lack of understanding, competence, and humanism." (Leahy Aff. Exh. Y.) The terms of the resignation were negotiated by attorneys for the District and the NTA and are reflected in a September 30 letter countersigned by Richardson. (*See* Leahy Aff. Exh. X.)

On October 5, 1993, the Board of Education met to consider Richardson's resignation. Two of the eight Board members at the meeting were African–American. One of those two, Elaine Magwood, suggested that the Board should consider less harsh alternatives, such as extending Richardson's probationary period or prohibiting future AP assignments. Magwood also expressed her opinion that the Board's actions may have been influenced by the fact that one of the three affected students (Richard Sanders, Jr.) was the son of a Board member. The Board voted, 6–2, to accept Richardson's resignation. The dissenting votes were cast by the two African–American members of the Board. (*See* Minutes of the Board's Oct. 5, 1993 Meeting, Leahy Aff. Exh. AA.)

On the following day, Mattausch called a meeting of the NFA faculty and advised them that Richardson had provided her students with questions from an unreleased AP English exam, that the unreleased materials had been obtained by Richardson when she worked at ETS, that three students were penalized as a result of the improper disclosure, that Richardson had been given the option of resigning, that she had chosen that option, and that the Board of Education had accepted her resignation the prior evening. (Mattausch Aff. ¶ 37 & Exh. G.) Mattausch states that he called this meeting in response to several rumors that were circulating around NFA concerning Richardson's absence, (*id.;* Def. 3(g) Statement ¶ 87), which Richardson generally denies (Pl.3(g) Statement ¶ 87).

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(d). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in the light most favorable to the non-moving party. *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 45 (2d Cir.1988).

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Upon the movant's satisfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct at 2511. At this stage, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Car-*

*ey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990).

Summary judgment should be employed sparingly in employment discrimination cases where the employer's intent, motivation, or state of mind are at issue. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir. 1988) (citing *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985)). A plaintiff "must nevertheless offer 'concrete evidence from which a reasonable juror could return a verdict in [her] favor,' . . . and is not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister,* 859 F.2d at 1114 (internal citation omitted). Moreover, "the summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive, and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri,* 759 F.2d at 998; cf. *McLee v. Chrysler Corp.,* 38 F.3d 67 (2d Cir.1994) (issuing writ of mandamus where the district judge, under the impression that the Second Circuit had precluded grants of summary judgment in employment discrimination cases, declined to consider whether summary judgment was appropriate). This is particularly true where, as here, full discovery has taken place. *Dister,* 859 F.2d at 1114.

## II. *Title VII*

Title VII of the Civil Rights Act of 1964 provides, *inter alia,* that it is unlawful for "an employer to . . . discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employ-

ment, because of such individual's race." 42 U.S.C. § 2000e–2(a)(1).

In determining a motion for summary judgment in a Title VII case, the district court's analysis must track the burden-shifting scheme that guides the trial of such cases. Under this scheme, the plaintiff bears the initial burden of establishing a prima facie case of employment discrimination by showing by a preponderance of the evidence that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of unlawful discrimination. See *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 & n. 13, 93 S.Ct. 1817, 1824 & n. 13, 36 L.Ed.2d 668 (1973); *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995).[3] The plaintiff may satisfy the last prong by demonstrating that similarly situated persons outside of the plaintiff's protected class were treated differently. *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir.1997) (citing *Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir. 1997)). Establishment of a prima facie case creates an initial presumption of unlawful discrimination. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094.

The burden of establishing a prima facie case "is not onerous." *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093). However, the fact that a plaintiff has satisfied these minimal prima facie elements "is no indication that, at the end of the case, plaintiff will have enough evidence of discrimination to support a verdict" in her favor. *Id.* at 1337.[4] Rather, the prima facie case "raises an inference of discrimination

---

**3.** The elements of the prima facie case may vary according to the facts relevant to the specific claim of discrimination. *See McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 104 (2d Cir.1989).

**4.** *See also id.* at 1337 ("discrimination cases differ from many areas of law in that under the

*McDonnell Douglas* burden-shifting framework a plaintiff's satisfaction of the minimal requirements of the prima facie case does not necessarily mean, even if the elements of the prima facie case go unchallenged, that plaintiff will ultimately have sufficient evidence to support a verdict on each element that plaintiff ultimately must prove to win the case").

only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Levin v. Analysis & Tech., Inc.*, 960 F.2d 314, 316 (2d Cir.1992) (quoting *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). In essence, the presumption temporarily excuses the plaintiff from having to show that discrimination actually existed and caused the termination. *Fisher*, 114 F.3d at 1337.

■ If the plaintiff does demonstrate a prima facie case and a presumption of unlawful discrimination thereby arises, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for terminating the plaintiff. Any such reason will suffice; the employer " 'need not persuade the court that it was actually motivated by the proffered reasons' in order to nullify the presumption and obligate the plaintiff to satisfy the burden of proof." *Id.* at 1335–36 (quoting *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094).

■ If the employer satisfies this burden of production, the presumption of discrimination "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) (citing *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). At this stage, a plaintiff may prevail only if she shows by a preponderance of the evidence that the employer's proffered explanation is a pretext for discrimination, "either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both." *Fisher*, 114 F.3d at 1339; *see also Hicks*, 509 U.S. at 515–16, 113 S.Ct. at 2751–52 (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94). A plaintiff does not win merely by proving the asserted reason to be false; rather, an employer's proffered reason must be false and its real reason must be unlawful discrimination. *Hicks*, 509 U.S. at 515–16, 113 S.Ct. at 2751–52; *Fisher*, 114 F.3d at 1338–39; *Quaratino*, 71 F.3d at 64. In other words, the burden-shifting framework does not alter the fact that the plaintiff at all times bears the ultimate burden of persuading the trier of fact that the defendant unlawfully discriminated against her. *Quaratino*, 71 F.3d at 64. With the presumption no

longer operating, "[t]he question becomes the same question asked in any other civil case: Has the plaintiff shown, by a preponderance of the evidence, that the defendant is liable for the alleged conduct?" *Fisher*, 114 F.3d at 1336.

### A. Richardson's Prima Facie Case

As explained above, Richardson bears the initial burden of establishing a prima facie case of employment discrimination by showing by a preponderance of the evidence that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of unlawful discrimination. *See Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *Quaratino*, 71 F.3d at 64. Richardson may satisfy the last prong by demonstrating that she was treated differently than similarly situated white persons. *Shumway*, 118 F.3d at 63.

■ 1. *First and Third Prongs.* Richardson, an African–American, is clearly a member of a protected class. In addition, even though Richardson ultimately resigned before the Board voted on Leahy's recommendation to terminate her, she has satisfied the "discharge" prong of the prima facie case by demonstrating a "constructive discharge." By all indications, the District would have terminated her had she not resigned. *See Riedinger v. D'Amicantino*, 974 F.Supp. 322, 330 (S.D.N.Y.1997) ("A constructive discharge may be inferred when an employer threatens an employee with termination [or] suggests that she resign. . . ."); *Doria v. Cramer Rosenthal McGlynn, Inc.*, 942 F.Supp. 937, 947 (S.D.N.Y.1996) ("The most common constructive discharge case involves veiled or direct threats that failure to resign will result in discharge."); *see also Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir.1993) (discussing *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184 (2d Cir.1987)).

2. *Second Prong.* The parties did not directly address the issue of whether Richardson satisfactorily performed the duties required by her position as a NFA English teacher. Notwithstanding evidence in the

District's moving papers that Richardson may have, for example, left her classes unattended at times, the record unequivocally demonstrates that at least until Richardson's distribution of the unreleased examination questions, District officials regarded her performance as satisfactory.

 However, in essence the District is claiming that this incident rendered her performance unsatisfactory and constituted grounds for termination. Where, as here, an employer presents "evidence of unsatisfactory work performance as a legitimate reason for an adverse employment action, a Title VII plaintiff must rebut those reasons to survive a summary judgment motion." *Kenner v. Glasheen,* No. 92–0653, 1997 WL 651477, at *6 (S.D.N.Y. Oct.17, 1997). Richardson admits that she distributed "live" exam questions, although she maintains that she did so unintentionally. The District, however, does not contend that Richardson's actions were intentional. Rather, the District viewed the incident as a reflection of poor judgment for which Richardson should be terminated regardless of whether her conduct was intentional. It was within the District's discretion whether to treat Richardson's transgression as a failure to satisfactorily perform her job and, accordingly, as grounds for termination. *Cf. Thornley v. Penton Publ'g. Inc.,* 104 F.3d 26, 29 (2d Cir.1997) ("Whether job performance was satisfactory depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge.").

That said, we doubt the propriety of granting summary judgment on the sole ground that Richardson has failed to meet the "satisfactory performance" prong of the prima facie case, where the gravamen of her lawsuit is that racial bias was a controlling factor in her resignation. Therefore, we will proceed to consider whether Richardson has satisfied the fourth and final prong of the prima facie case—that is, whether the resignation occurred under circumstances giving rise to an inference of unlawful discrimination.

3. *Fourth Prong.* Richardson attempts to raise an inference of racial discrimination in two ways. First, she contends that Superintendent Leahy's recommendation to terminate her was the product of the District's capitulation to the racially-motivated hostility of Richardson's colleagues. This contention did not appear in her Complaint. Second, Richardson argues that in recommending her termination, the District treated her differently than similarly situated non-African Americans.

i. *Capitulation to racial resentment.*

 Cutting through the rhetoric, hyperbole, and factual distortions of Richardson's motion papers, her "racial backlash" argument can be distilled into two components. First, Richardson contends that her colleagues in the "clubby" NFA English Department unleashed a "backlash reflecting perceived white displacement after she had obtained a 'plum' job at NFA." (Pl. Mem. at 20–21.) She asserts that this "mountain of resentment ... is virtually unexplainable without reference to her race." (*Id.* at 15.) Second, Richardson maintains that the judgment of District officials was tainted by the animus of her colleagues. The only problem with Richardson's theory is that she supplies no proof supporting it.

The alleged "mountain of resentment" amounts to the following. First, Katherine Denman, NFA's other AP English teacher, testified in her deposition that she had grown to distrust Richardson's character and veracity. This distrust was based on Richardson's subsequently-disproved suggestion to District officials that she might have gotten the unreleased questions from Denman's files, as well as on "minor" things she had heard from other teachers and students. (Denman Dep. at 45–50.)

Second, Judith McAvey, the teacher with whom Richardson prepared the Multicultural Literature course, told Director Mattausch that a curriculum outline submitted by Richardson, and presented by Richardson as her own work, turned out to be identical to a table of contents in an already-published book. (Mattausch Dep. at 31–32.)

Third, another teacher, Geralyn Peterkin, bought Richardson a congratulatory cake after Richardson allegedly told her that she (Richardson) had been granted tenure. Mat-

tausch heard about this from Mary Popora, a teacher who called him to ask how a teacher who had not been in the District for the requisite three years could have received tenure. Mattausch responded that Richardson had not been granted tenure. When he went to the English office to see what was going on, Mattausch saw the cake and a sign congratulating Richardson for receiving tenure. Mattausch spoke with Peterkin, who had bought the cake, and Peterkin relayed her conversation with Richardson. (*Id.* at 34–36.)

Fourth, in addition to her awareness of Richardson's alleged lie about receiving tenure, Popora expressed to Mattausch concern regarding Richardson's classroom practices and relationship with her students. (*Id.* at 44–45, 74.)

Fifth, Mattausch testified at his deposition that two or more NFA English teachers had indicated to him that at times they had seen Richardson leaving her students unattended and having them collate papers for her. (*Id.* at 38–40.)

Finally, Frank Colone, the president of the NTA and an English teacher at NFA, stated at his deposition that in the past there have been complaints made to the union by white teachers that positions were going to minorities, and by minorities that positions were going to whites. These complaints were not common, and there had never been such a complaint in the NFA's English Department. (Colone Dep. at 53.)

Even drawing all reasonable inferences in Richardson's favor, as we must on summary judgment, the supposed mountain of racial resentment more closely resembles a molehill of non-racial, and possibly justifiable, annoyance. To begin with, Richardson has failed to document that her colleagues harbored a "widespread animus" toward her. (Pl. Mem. at 28.) Richardson's evidence indicates that about 20% of the teachers in the NFA English Department expressed concerns about her at one time or another; she has presented no evidence that any of the remaining 80% ever commented about her, let alone expressed resentment. More significantly, even assuming that Richardson was distrusted by a few NFA English teachers, there is

not a single shred of evidence that these concerns were racially motivated. Simply because (1) some teachers had complaints about Richardson, and (2) Richardson is African–American, does not impel the conclusion that (3) those teachers had misgivings about Richardson *because* she is African–American. This is the type of groundless speculation that summary judgment is designed to root out.

The only suggestion of anything even remotely resembling racial animus is the deposition testimony of NTA president Colone, that some white teachers in the past had complained that minority candidates were being chosen over white prospective teachers. However, there are several problems with Richardson's use of this fact as evidence of racial resentment against her appointment. First, and least importantly, Colone indicated that these complaints flowed both ways—that is, minorities also complained that whites were getting the jobs. Second, Colone stated that these complaints were not common. Third, and above all, there is nothing to suggest that any such complaint had anything to do with Richardson. In fact, Colone stated that none of the complaints he received had emanated from or were directed at the NFA English Department.

Not only is Richardson unable to establish a "backlash reflecting perceived white displacement" among some NFA English teachers, but even assuming for the sake of argument that one did exist, Richardson cannot demonstrate that District officials recommended her termination as a concession to this animus. Richardson's primary "proof" of this "acquiesce[nce] to irrational majoritarian demands," (Pl. Mem. at 24), consists of the following. First, she notes that Director Mattausch gave her slightly lower marks in some categories on her 1992–1993 annual evaluation than he had in 1991–1992. (*Id,* at 3, 22; Mattausch Dep. at 56–75; Wotorson Aff. Exh. 4.) In at least one category, the downward shift was related to observations about Richardson's performance first made by another English teacher, Mary Popora. (Mattausch Dep. at 74.) Second, Richardson points out that Mattausch "arbitrar[ily]" removed her from a curriculum-revision project

that she had been working on with the other AP English teacher, Katherine Denman. (Pl. Dep. at 107; Pl. Mem. at 12, 22–23.)

Based on these two points, Richardson asserts that

[a] rational jury may conclude that if district officials acted in furtherance of the resentment expressed by their white teachers—to the point where they evaluated Dr. Richardson differently and removed her from a curriculum revision project—those same school officials were of a mind to terminate her or deny her tenure in response to the same resentment.

(Pl. Mem. at 23.) We cannot agree. Director Mattausch had every right to evaluate Richardson as he did. Taking into account evidence of Richardson's performance that was first called to his attention by another teacher does not amount to capitulation. With respect to Richardson's removal from one of the two curriculum-revision committees on which she served, Mattausch has provided plausible and benign administrative reasons for doing so. (*See* Mattausch Dep. at 94–95.) His explanation is contested only by groundless speculation. In any event, Mattausch removed Richardson from the AP English curriculum committee after her distribution of "live" AP English examination questions had come to light. (*See* Pl. Dep. at 107–08.) Under these circumstances, one might expect that the District would not want such a teacher serving on that committee.

As additional evidence of capitulation, Richardson relates how, before the incident involving the distribution of the "live" AP English questions, the mother of Richard Sanders, Jr. (one of the three students who would later have their AP English scores challenged by ETS)—who was also the wife of one of the members of the District's Board of Education—asked Mattausch whether Richardson was using the "twelve-point grading scale" (*i.e.,* pluses and minuses). (Mattausch Dep. at 49–50.) Mattausch asked Richardson whether she was employing this grading system; Richardson said she was. Mattausch then confirmed this by checking Richardson's grade book. (*Id.* at 50–52.) From this incident, Richardson concludes

that a "prominent white member of the Board of Education wanted her terminated at all costs," (Pl. Mem. at 23), and that Mattausch's checking the grade book of such an experienced teacher "may only be explained in the context of deep-seated animus towards Dr. Richardson" (*id,* at 24). Suffice it to say that this conclusion is wholly unjustified by the facts.

As if it weren't taking on enough water already, Richardson's capitulation theory is finally dragged under by her inability to tie these pieces of "evidence" to the actions of the ultimate decision makers. There is no evidence that the ultimate, unanimous decision to recommend Richardson's termination—made by Superintendent Leahy, then-Assistant (now Associate) Superintendent Hamlin (who, incidentally, is African–American), Assistant Superintendent Swart, and Deputy Superintendent Pizzo—was affected by any of the concerns expressed to Director Mattausch. Indeed, there is no evidence that the Superintendent's office was even aware of them. The record reflects nothing more than that Leahy, Hamlin, Swart, and Pizzo decided to recommend to the District Board of Education that Richardson be terminated because of their disapproval of her conduct (whether deliberate or merely negligent) in compromising the integrity the May 10, 1993 AP English examination.

Several other observations support the conclusion that racial bias had nothing to do with Richardson's resignation. First, Richardson herself quotes the conclusion of NTA president Frank Colone that—because one of the students affected by the tainted AP exam questions was the son of a member of the District Board of Education—Richardson's termination "was blatantly political because of the persons and personalities involved. Dr. Richardson became a political football . . . " (Pl. Mem. at 25; Letter from Colone to members of NFA English Dep't, dated Oct. 18, 1993, attached as Exh. 20 to Wotorson Aff.) This conclusion presents the worst-case scenario in this matter: at most, the decision by the Superintendent's Office to recommend Richardson's termination, and the Board's subsequent acceptance of Richardson's resig-

nation, was affected by institutional politics. This view, and not the conclusion that Richardson's race affected the District's decision, represents the most serious inference that Richardson's evidence will reasonably support.

Second, at no point before filing a complaint in this Court did Richardson indicate to the District that she considered race to have been a factor in its decision to terminate her. She merely explained time and again that her transgression was inadvertent and that her punishment should have been less severe. Indeed, her resignation letter simply decried a "lack of understanding, competence, and humanism." (Leahy Aff. Exh. Y.) Richardson also declined Leahy's offer to present her contentions to the Board of Education.

Finally, although Richardson accuses the District of exhibiting "a lack of racial sensitivity," (Pl. Mem. at 27), uncontroverted evidence in the record indicates that the District (and Leahy and Mattausch in particular) did a commendable job of recruiting and hiring minority teachers. (See Def. Rule 3(g) Statement ¶ 71–86; Leahy Aff. ¶ 3–12 and Exhs. A & B attached thereto; Mattausch Aff. § ¶ 3–8.) Even the president of the NTA stated: "To me it's pretty obvious that the District was clearly interested in hiring ... qualified minority teachers...." (Colone Dep. at 53.)

Indeed, Leahy and Mattausch were instrumental in hiring Richardson for the 1991–1992 school year and in securing her appointment as a full-time English teacher for the following school year. Moreover, they essentially created a new position for her and gave her coveted assignments. Richardson, who had no prior experience teaching within the District, was hired in spite of the District's collective bargaining agreement with the NTA, which provided that "[s]eniority in the District shall be a significant factor in filling open positions." (Collective Bargaining Agreement, Art. VIII § B.3, attached as Exh. A to Mattausch Aff.) As a result of this provision, Richardson was the first person in

over twenty years to be hired into the NFA English Department without prior full-time teaching experience in the District.[5]

In sum, Richardson has failed to provide a wisp of evidence to support her capitulation-to-a-mountain-of-racial-resentment theory. She thus cannot satisfy her prima facie burden on the basis of this theory. We turn, then, to her alternate, disparate treatment argument.

### ii. *Disparate treatment.*

As noted above, Richardson may also establish an inference of unlawful discrimination, and thereby satisfy the fourth prong of her prima facie case, by demonstrating that she was treated differently than similarly situated non-African Americans. *Shumway,* 118 F.3d at 63. To be "similarly situated," the persons with whom Richardson attempts to compare herself "must be similarly situated in all material respects." *Id.* at 64. Relevant factors include the comparability of the misconduct and occupational status. *See id.; Hargett v. National Westminster Bank,* 78 F.3d 836, 839–40 (2d Cir.1996); *Henry v. Daytop Village, Inc.,* 42 F.3d 89, 97 (2d Cir.1994).

Richardson is clearly grasping at straws with her disparate treatment argument. She cites disciplinary measures taken against six white District employees that were less severe than the sanction she received. In none of those cases was the misconduct at issue remotely similar to the misconduct at issue here. The level of generality at which Richardson attempts to compare the various instances of misconduct—*i.e.,* "poor judgment"—is contrary to case law and would render disparate treatment analysis meaningless. In addition, several of those cases involved tenured teachers who, unlike the probationary Richardson, were entitled to receive the substantive and procedural protections of Sections 3020 and 3020–a of the New York State Education Law.

Moreover, in the only prior incident involving a teacher improperly disclosing examina-

---

**5.** The second such hire was Valerie Jennings in September 1996. Ms. Jennings is also African-American. (Mattausch Aff. ¶ 8.)

tion questions prior to administering the exam, the District Board of Education followed Superintendent Leahy's recommendation and terminated the teacher, Elba Rios. (*See* Wotorson Aff. Exh. 44.) Like Richardson, Rios was a probationary teacher at NFA. Like Richardson, she disclosed exam questions to her students prior to the exam date. And like Richardson, the error cost Rios her job.

Incredibly, while asserting the comparability of several wholly dissimilar incidents, Richardson contends that the Rios case is distinguishable from hers. (See Pl. Mem. at 29.) The only differences between the Richardson and Rios cases appear to be that Rios was terminated in part because of her poor teaching performance, and that Rios compromised a local, as opposed to a national, exam. Although Rios' termination was in part a product of incompetent performance, which was not a factor in Richardson's case, the consequences of Richardson compromising the nationally administered AP English examination—to the students, the NFA, and the District—were arguably more significant than those involved in Rios' premature disclosure of a local exam. In any event, in the case most similar to Richardson's, the District meted out the same punishment—termination.

We find that Richardson is wholly unable to demonstrate that the circumstances surrounding her resignation gave rise to an inference of racial discrimination. Accordingly, Richardson cannot establish a prima facie case of unlawful discrimination despite its minimal requirements.

### B. *Richardson's Title VII Claim is Dismissed*

■ Even assuming that Richardson could meet her prima facie burden, the District has clearly articulated a legitimate, nondiscriminatory reason for recommending Richardson's termination. Richardson must provide proof not only that the District's explanation is false, but also that unlawful discrimination was its true motivation in moving to terminate her. *See Hicks,* 509 U.S. at 515–16, 113 S.Ct. at 2751–52; *Fisher,* 114 F.3d at 1338–39. Richardson can do neither.

Apparently, Richardson and her attorneys are unaware that Title VII is not an all-purpose tool for disgruntled employees wishing to challenge their employers' legitimate, if harsh, business decisions. *Cf. Jimoh v. Ernst & Young,* 908 F.Supp. 220, 226 (S.D.N.Y.1995) ("To prove [a] racial discrimination claim, plaintiff must do more than simply disagree with defendant's business decisions.") As discussed above, Richardson has provided no probative evidence of unlawful discrimination.

Any additional facts or arguments put forth by Richardson that are not discussed above have been duly considered by this Court and are meritless. The District's motion for summary judgment on Richardson's Title VII claim is granted.

### III. *New York State Human Rights Law*

■ Based on the same alleged racial discrimination, Richardson also brings a claim under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296. Although we are dismissing Richardson's Title VII claim, we exercise our discretion under 28 U.S.C. § 1367(c) to retain supplemental jurisdiction over her NYSHRL claim based on judicial economy and the close relationship between her federal and state claims. *See Kudatzky v. Galbreath Co.,* No. 96–2693, 1997 WL 598586, at *8 (S.D.N.Y. Sept.23, 1997); *Aquinas v. Federal Express Corp.,* 940 F.Supp. 73, 79 (S.D.N.Y. 1996); *Sweet v. Electronic Data Sys., Inc.,* No. 95–3987, 1996 WL 204471, at *3 (S.D.N.Y. Apr.26, 1996).

■ The NYSHRL provides, *inter alia,* that it shall be an unlawful discriminatory practice for an employer to discharge or otherwise discriminate against any employee because of her race. N.Y. Exec. Law § 296(*l*)(a) (McKinney Supp.1997). The same analysis is used to determine the sufficiency of Title VII and NYSHRL claims. *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 479, 102 S.Ct. 1883, 1896, 72 L.Ed.2d 262 (1982); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714–15 (2d Cir.1996) (cit-

ing *Miller Brewing Co. v. State Div. of Human Rights,* 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985)); *Boyce v. New York City Mission Soc.,* 963 F.Supp. 290, 295 (S.D.N.Y.1997).

Therefore, because our Title VII analysis dictates our determination of the pendent NYSHRL claim, we grant the District's motion for summary judgment with respect to the latter claim as well.

## IV. *Contract/Privacy Claim*

As her third and final cause of action, Richardson complains that the District "permitted the disclosure of confidential material concerning [her] in breach of her contractual rights and in violation of her common law privacy rights." (Compl. ¶ 53.) We will exercise supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367(c).

There are several problems with this claim. To begin with, Richardson's brief in opposition to summary judgment, while purporting to address this third cause of action, argues an entirely different point. The complaint appears to take issue with the information disclosed by Mattausch at the October 6, 1993 faculty meeting. Yet in her motion papers, Richardson contends that the District "breached a contract by terminating Dr. Richardson's employment." (Pl. Mem. at 32.) She appears to be arguing that either Superintendent Leahy's recommendation to terminate her or the Board's acceptance of her resignation constituted a contractual breach. (*See id.* at 32–34.) Although this contention appears meritless, we need not address it because Richardson did not raise it in her complaint. *See Corporate Training Unlimited, Inc. v. National Broadcasting Co.,* 981 F.Supp. 112, 122–23 (E.D.N.Y.1997); *Penny Lane Owners Corp. v. Conthur Development Co.,* No. 94–0940, 1997 WL 563866, at *1 (S.D.N.Y. Sept.10, 1997). Because we are dismissing Richardson's federal claim, she will not be allowed to amend her complaint. *Cf. Penny Lane Owners Corp.,* 1997 WL 563866, at *1.

At the same time, Richardson did not brief the claim that she does appear to have raised in the complaint—i.e., that Mat-

tausch's disclosures at the October 6, 1993 faculty meeting violated her contractual and privacy rights. Regardless of Richardson's inattention to this claim, it suffers from two fatal flaws. First, there simply is no common law right of privacy under New York law. *Groden v. Random House, Inc.,* 61 F.3d 1045, 1049 (2d Cir.1995); *Hurwitz v. United States,* 884 F.2d 684, 685 (2d Cir. 1989); *Howell v. New York Post Co.,* 81 N.Y.2d 115, 612 N.E.2d 699, 703, 596 N.Y.S.2d 350, 354 (1993). Second, Richardson has identified no contractual provision that Mattausch's faculty-meeting disclosures allegedly breached. According to the District, this is because there is no such provision. (Def. Mem. at 16; Mattausch Aff. ¶ 38.) Richardson has failed to present a triable issue as to any contractual breach.

Accordingly, the District's summary judgment motion is granted with respect to Richardson's third cause of action.

## CONCLUSION

For the reasons discussed above, the District's motion for summary judgment is granted with respect to all claims. Richardson's Complaint is dismissed in its entirety. An appropriate judgment shall be entered by the Clerk of the Court.

SO ORDERED.