**Mara MCFADDEN, Plaintiff,**

v.

**STATE UNIVERSITY OF NEW YORK, COLLEGE AT BROCK-PORT, Defendant.**

**No. 99–CV–6202L.**

United States District Court, W.D. New York.

March 28, 2002.

Donna Marianetti, Irving Place, Rochester, NY, for Plaintiff.

Emil J. Bove, Office of New York State Attorney General, Rochester, NY, for Defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiff, Mara McFadden, commenced this action on May 18, 1999, alleging claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the New York State Human Rights Law, Exec.L. § 296. Plaintiff, who was employed as an Assistant Professor in the English Department at defendant State University of New York ("SUNY"), College at Brockport ("Brockport") up until her termination in September 1999, alleges that defendant discriminated against her on account of her sex, and retaliated against her for having opposed that discrimination. Defendant has moved for summary judgment.

## FACTUAL BACKGROUND

Viewing the record in the light most favorable to plaintiff, the nonmoving party, the facts are as follows. Plaintiff, who holds a Ph.D. in English, began her employment at Brockport in August 1991. At the time of her hire, the Appointment, Promotion and Tenure ("APT") Committee at Brockport, which had interviewed and recommended hiring plaintiff, informed her of what she would need to accomplish in order to be granted tenure, for which

she was expected to become eligible in about six years.

Plaintiff alleges that she was told that her contributions would be weighed in three areas: teaching, service, and scholarship. She claims that the APT Committee told her that these three areas would be weighed in the aggregate, so that any perceived deficiency in one could be offset by strength in the other two areas.

The requirements for tenure (sometimes referred to as "continuing appointment") were also set forth in a document containing "Guidelines for Continuing Appointment," which was distributed to all Brockport faculty members annually. *See* Affirmation of Richard Meade (Docket No. 18), Exs. C – I. Plaintiff testified at her deposition that she had received copies of these documents. Plaintiff's Depo. (Defendant's Motion Ex. C) at 94. The guidelines in effect from the 1991–92 academic year through the 1996–97 academic year, which were essentially unchanged throughout that period, stated that a recommendation for continuing appointment would be based primarily on an evaluation of the candidate's performance in each of several categories: "mastery of subject matter"; "effectiveness of teaching"; "scholarly ability"; "effectiveness of university service"; and "continuing growth." [1] "Scholarly ability" would be assessed "as demonstrated by such things as success in developing and carrying out significant research work in the subject matter field, contribution to the arts, publications and reputation among colleagues."

The guidelines also stated that a "positive recommendation for continuing ap-

pointment reflects the expectations that the person has the potential for attaining the highest rank in the department...." In plaintiff's case, this would have been the rank of Associate Professor.

The guidelines in effect during the 1997–98 academic year, when plaintiff's tenure application was considered, were differently worded, but substantively similar to the previous guidelines. [2] Those guidelines stated that "[t]raditionally, [Brockport] has considered three primary categories as the basis for review in all personnel actions," namely "teaching effectiveness," "scholarship, research and creative work," and "college, community, and professional service." Meade Aff.Ex. I at 6. The guidelines stated that "[t]he other two criteria, Mastery of Subject Matter and Continued Growth, are reflected by sustained contributions and demonstrated excellence in the above-noted three categories." The guidelines also stated that "each faculty member is expected to provide quality contributions in all three areas. The quantity of the expected contribution may vary, depending on institutional need in the primary categories." *Id.*

Like the prior guidelines, the 1997–98 guidelines also stated that "[c]andidates for continuing appointment should demonstrate potential for promotion to the next academic rank," and that a recommendation of continuing appointment "reflects the expectations that the person has the potential for attaining the highest rank in the department." To be promoted to Associate Professor (the next-highest rank above plaintiff's rank of Assistant Professor), the guidelines stated that "the person must show significant advancement in the area of scholarship beyond the level of

---

**1.** A sixth factor was "programmatic considerations," *i.e.,* the particular needs of the person's department.

**2.** There is no contention here that the outcome of plaintiff's tenure review was in any way affected by, or dependent upon, which set of guidelines were in effect at the time.

Assistant Professor.... The demonstration of scholarship must include a product/performance that is subject to external peer review and contributes to the body of knowledge in the field." *Id.* at 9.

Under ordinary circumstances, plaintiff would have been eligible for tenure review during the 1996–97 academic year. In a letter to Dean Robert McLean of Brockport's College of Letters and Sciences dated October 8, 1996, however, plaintiff requested that her tenure review be deferred for one year. Plaintiff stated that there were three reasons for this request: first, her consecutive years of service had been interrupted in 1996 because she taught a reduced course load that Spring for medical reasons. Second, there was about to be a change in the presidency of the college, so a one-year deferment would avoid having the review process begin under one president's administration and conclude under another's. Third, the faculty workload had been increasing for some time, but that increase was just beginning to be recognized in the tenure review process. Affirmation of Robert McLean (Docket Item 20) Ex. C.

McLean wrote a memorandum on October 25, 1996, to Barbara P. Sirvis, Vice President for Academic Affairs, stating that he supported plaintiff's request for an extension. He stated that he based his support

> on the fact that Dr. McFadden essentially lost the spring 1996 semester and a good part of the summer because of her recent pregnancy. She is very close to meeting the scholarship expectations of the English department. She has three articles under review, any one of which would put her over the top. It is possible that what she has now is quite adequate, but she feels that a positive re-

sponse on one of her pending articles would remove any question.

McLean Aff.Ex. D.

By letter dated March 7, 1997, Sirvis offered plaintiff a one-year renewal of plaintiff's academic rank for a term appointment from September 1, 1998 through August 31, 1999, thereby granting plaintiff's request for a deferment of her tenure review. Plaintiff accepted the offer by signing the letter on April 7, 1997. McLean Aff.Ex. E.

Plaintiff's tenure review began in the Fall of 1997. Her application was considered by the APT Committee, which was composed of faculty members John Maier, Stanley Rubin, Vincent Tollers, Alice Brand, and Earl Ingersoll.

The composition of the APT Committee is the source of some dispute in this case. The committee was to have five members, who were chosen annually. In a memorandum to "All Department Members" dated June 3, 1997, Paul Curran, who at that time was the Chair of the English Department, asked the department members to vote for five candidates for the APT Committee. The memo listed the five faculty members named above as Curran's recommendations, followed by a blank line labeled "Other," for write-in votes. Affirmation of Paul Curran (Docket Item 21) Ex. B.

In another memo dated July 21, 1997, Curran stated that "[s]ince [he] received only five responses for [his] request for votes concerning the standing committees assignments for the coming year, the assignments stand as described in the earlier memo." Curran Aff.Ex. Q.

The dispute here concerns the absence from the ballot of Evelyn S. Newlyn, a member of the English Department Faculty. Newlyn testified at her deposition that she had indicated to Curran that she was

interested in serving on the APT Committee during the 1997–98 academic year, and that she was surprised when she did not see her name on the ballot "because usually everybody who volunteers is on the committee they volunteer for." Newlyn Depo. (attachment to Docket Item 29) at 10. She testified that she asked Curran why she was left off the ballot, and he replied that he thought that she did not want to serve on the committee that year due to her health problems. Newlyn Depo. at 10–11.

At Newlyn's deposition, some documents were introduced relating to these events.[3] The first, described as an "anticipated activities sheet," Newlyn Depo. at 9, was a form filled out by Newlyn indicating what teaching and other activities at Brockport she expected to participate in during the 1997–98 academic year. Under "Department or College committees," Newlyn listed: "Graduate Committee; others not known yet, but may include APT Committee. I have volunteered to work on Assessment." [4]

In a memo that Newlyn allegedly faxed to Curran dated June 11, 1997, Newlyn stated that in an earlier conversation with Curran, Newlyn "had indicated interest in being on the APT Committee for next year, and was therefore surprised not to see my name listed. However, since I can confirm that I would serve, I would like my name to be on the ballot."

In what appears to be a letter or memo to Curran from Newlyn dated March 18, 1998, Newlyn also stated, "Last year ... I indicated to you my interest in being on the APT Committee for this current year of 1997–98 and therefore included the APT

Committee among the other service work I listed as expected for this year, on the blue Anticipated Workload form that went with our Annual Reports to the dean."

Plaintiff contends that the real reason that Curran did not nominate Newlyn to serve on the APT Committee was that he knew that Newlyn supported plaintiff's upcoming candidacy for tenure, which Curran opposed. Newlyn testified that had she been on the committee, she would have voted in favor of plaintiff's candidacy. Newlyn Depo. at 11. She described plaintiff as a friend. Newlyn Depo. at 38.

Curran himself testified that he did not recall Newlyn volunteering for the APT Committee, and that

if Dr. Newlan [sic] had volunteered, I probably would have put her name on the ballot. I had some reservations about Dr. Newlan serving and she had expressed concerns about her health to me on a number of occasions and about the effect of stress on her.

This was a—this particular year, in addition to the tenure decision, was a very busy year for the department and I would have had concerns about it.

Plaintiff's counsel then asked him, "But you would have put her on the ballot?," to which Curran replied, "Oh, yeah." Curran Depo. (attachment to Docket Item 29) at 15–16.

In his affirmation, Curran states,

I proposed that Alice Brand should be a member of the 1997–1997 ENL [English Department] APT Committee which considered Plaintiff's tenure application because [he] felt that it was important that a female should participate and the

---

3. Copies of these documents are attached to the excerpt from Newlyn's Deposition submitted by plaintiff.

4. It does not appear that the "assessment" referred to related to the work of the APT Committee, since in a March 18, 1998 memo to Curran Newlyn discusses assessment and the APT Committee separately.

only available choices were Alice Brand and Evelyn Newlyn. Alice Brand had been on the 1994–1995 APT Committee which had recommended that Plaintiff's appointment be renewed and I thought she would be objective. On the other hand, I was aware that Evelyn Newlyn had long standing health problems and that there were a number of substantial issues before the APT Committee that year, including applications for tenure and promotion and searches.

Curran Aff. ¶ 57.[5]

At a meeting on November 12, 1997, the APT Committee voted, 3–2, against supporting plaintiff's application for continuing appointment. Affirmation of John Maier (Docket Item 19) ¶ 14 and Ex. B. Maier and Rubin were the two members who voted in favor of plaintiff's application. Maier Aff. ¶ 14; Rubin Depo. (attachment to Docket Item 29) at 51.

Two days after this vote, on November 14, 1997, the APT Committee prepared and sent a memorandum to Dr. Paul Yu, Brockport's President, recommending that plaintiff not be granted continuing appointment. Maier Aff.Ex. C. Curran also received a copy of the adverse recommendation. The memorandum stated, *inter alia*, that the committee found that plaintiff's performance in the area of scholarship was "not adequate." In particular, the committee stated that plaintiff's publications were "few and the rate of publishing [was] declining." The committee noted that although plaintiff had contributed 274 entries in the 1992 *Bloomsbury Guide to*

*Women's Literature*, "[s]ince then the candidate has published one scholarly article."

The APT Committee stated that it

recognized that bind that the untenured faculty members may find themselves in at Brockport. Dr. McFadden not only served on departmental committees, but chaired two of them, including the APT Committee itself. (Under the new college rules, this would not be allowed now.)[6] If Dr. McFadden felt that she was being encouraged to serve on committees of the department, she may well have wondered if such service would replace the emphasis on scholarship. A reading of the annual reports suggests that such was not the case. But the Committee is concerned that untenured faculty not be given mixed signals about the importance of service.

*Id.*

The "annual reports" referred to in the memorandum were reports that plaintiff (as well as other faculty members) prepared and the English Department Chair "sign[ed] off on" each year, Maier Depo. at 30, listing her accomplishments over the past year and expectations for the coming year. The committee stated that "[t]he annual reports show that both the candidate and the chairpersons were keenly aware of the importance of published scholarship," but that as the years went by, "the promise [of scholarly production on plaintiff's part] was not being realized." Specifically, the memorandum stated that when two forthcoming bibliographical en-

---

**5.** At page six of its Reply Memorandum of Law, however, defendant states that Curran "saw the need for a female on the Committee and felt Alice Brand would have been more fair than Evelyn Newlyn who was clearly aligned with the Plaintiff." It is not clear what the basis is for this assertion that Curran thought that Brand would be fairer than Newlyn, since neither Curran's affirmation nor his

testimony appears to contain any such statement.

**6.** Maier testified at his deposition that this was a reference to the fact that the rules had been changed to provide that "all members of the APT Committee be senior members of the department." Maier Depo. (attachment to Docket Item 29) at 28–29.

tries and a two-page book review written by plaintiff appeared, "Dr. McFadden will have published in all about twenty-four pages since 1992: one article and three book reviews."

Maier also states in his affirmation that [t]he record of [plaintiff's] scholarship as set forth in her annual reports documented that she had submitted a number of articles to peer reviewed journals but only one was accepted for publication. This suggests that she had the time to engage in scholarly work but that her peers determined that her work was not worthy of being published.

Maier Aff. ¶ 20. He testified at his deposition that in her annual reports, plaintiff "regularly indicated that she would be, for example, turning chapters of her dissertation into publishable articles and presenting papers at meetings and turning such papers into publishable articles," but that in fact many of those articles were never completed or published. Maier Depo. at 30.

The APT Committee did state that plaintiff's performance in the area of teaching was "better than adequate," and that her performance in the area of service was "adequate for the candidate's rank, Assistant Professor." Regarding the "service" category, the committee expressed its "concern ... about the mixed signals sent to untenured faculty members: on the one hand, an encouragement to serve on (and even chair) departmental committees; and on the other hand, a discouragement to serve when such service takes time away from scholarship."

Despite plaintiff's adequacy in these two areas, however, the APT Committee "reluctantly agreed that [plaintiff's] performance in this important area [scholarship] is not adequate." Accordingly, the committee concluded that "Dr. McFadden had not demonstrated the potential for ap-

pointment to the next rank and the Committee could not expect that she would attain the highest rank in the department." Maier Aff.Ex. C.

On December 23, 1997, Curran submitted his recommendation regarding plaintiff's tenure application to President Yu. He echoed the APT Committee's conclusions, stating that while plaintiff's "teaching and service accomplishments [we]re substantial," because Curran "d[id] not see potential for any early and substantial improvement in Dr. McFadden's publication record (which would be necessary to support a recommendation for promotion)," Curran could not recommend plaintiff for promotion to the rank of Associate Professor. Curran Aff.Ex. U.

In a memorandum dated February 18, 1998, Dean McLean also informed President Yu that he agreed with the recommendations of both the APT Committee and Curran. Noting that under the SUNY Board of Trustees' policies, "Candidates for continuing appointment should demonstrate potential for promotion to the next academic rank," and that a "positive recommendation for continuing appointment reflects the expectation that the person has the potential for attaining the highest rank in the department," McLean stated that "[i]n order for one to achieve the expectations expressed in the policies there must be a certain momentum in the flow of scholarship. That momentum is missing in this case." McLean Aff.Ex. F.

In a letter dated May 4, 1998, President Yu informed plaintiff that her appointment would not be renewed upon expiration, and that her services as a member of the Brockport faculty would cease as of September 1, 1999. Affirmation of Paul Yu (Docket Item 23) Ex. D.

Prior to the final decision by President Yu, plaintiff had already written a letter

to Curran on December 19, 1997, stating that she was challenging the APT Committee's recommendation. Curran Aff.Ex. T. On January 21, 1998, after Curran had submitted his recommendation to President Yu, plaintiff's attorney, Donna Marianetti, sent Yu a letter stating that she and plaintiff believed that "gender animus was the motivating factor" in the decision to deny plaintiff tenure, and requested "a formal review and investigation" of that decision. Meade Aff.Ex. R. In a letter dated February 7, 1998, Richard D. Meade, Brockport's Director of Human Resources, responded to Marianetti that "[s]ince no recommendations relating to tenure or promotion for Dr. McFadden ha[d] yet reached the attention of President Yu," Marianetti's request was premature.

Defendant asserts, and plaintiff does not dispute, that she took no additional steps to request any internal review or reconsideration of the decision to deny her application for tenure. Meade Aff. ¶ 58. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 27, 1998. Defendant's Motion (Docket Item 17) Ex. J. She filed a second EEOC charge on November 4, 1998, alleging retaliation. Plaintiff received a right-to-sue letter from the EEOC on March 12, 1999. Complaint ¶ 9.

Plaintiff filed the complaint in this action on May 18, 1999. She alleges that she was denied tenure on account of her sex. She also alleges that she was discriminated against in other ways as well during her employment at Brockport, such as in the assignment of course and student loads and salary increases. Plaintiff also asserts a claim that after she filed a charge of discrimination with the EEOC, defendant retaliated against her in a number of ways, e.g. by not providing her with a promised recommendation for another job, and by minimizing plaintiff's accomplishments in her annual written review.

## DISCUSSION

### I. General Standards for Analyzing Title VII Claims

■ The standards for deciding summary judgment motions in Title VII and other discrimination actions, which require application of the three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), are well-established and will not be repeated at length here. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000). In short, to make out a prima facie case in an action alleging discriminatory denial of tenure, a plaintiff must show that: (1) she belongs to a protected class; (2) she was qualified for tenure; (3) she was denied tenure; and (4) the denial of tenure occurred under circumstances giving rise to an inference of discrimination. *Grant v. Cornell Univ.*, 87 F.Supp.2d 153, 158 (N.D.N.Y.2000); *see also Zahorik v. Cornell Univ.*, 729 F.2d 85, 92 (2d Cir.1984). Defendant then has the burden to come forward with a legitimate, nondiscriminatory reason for the denial of tenure, and plaintiff has the ultimate burden of persuading the trier of fact that unlawful discrimination was the real reason she was denied tenure. *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

To overcome a well-founded motion for summary judgment in this action, then, plaintiff must show that there exists a genuine issue of material fact concerning whether the decision to deny her tenure was motivated by discrimination. Fed. R.Civ.P. 56(c); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 132 (2d Cir.), *cert.*

*denied*, 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000). Plaintiff can do so by presenting sufficient admissible evidence from which a rational finder of fact could infer that more likely than not she was the victim of intentional discrimination. *Bickerstaff v. Vassar College*, 196 F.3d 435, 447–48 (2d Cir.1999), *cert. denied*, 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000). In assessing the record to determine whether plaintiff has made such a showing, the court resolves all ambiguities and draws all reasonable factual inferences in favor of plaintiff, the party opposing the motion. *Id.* at 448.

Though these general principles are, as stated, well established, both the Supreme Court and the Second Circuit have had occasion to revisit and clarify them in recent years. In *Fisher v. Vassar College*, 114 F.3d 1332 (2d Cir.1997) (in banc), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998), the Second Circuit addressed the question of whether evidence sufficient both to make out a prima facie case and to support a finding of pretext necessarily suffices to support a finding of unlawful discrimination (or to preclude summary judgment for the defendant). A majority of the court in *Fisher* concluded that such evidence "is not always sufficient to sustain an ultimate finding of intentional discrimination." *Id.* at 1338. Accordingly, the court stated, "a Title VII plaintiff may prevail only if an employer's proffered reasons are shown to be a pretext for discrimination, either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both." *Id.* at 1339. *See also James*, 233 F.3d at 154 ("our holding in *Fisher* was that once the employer has proffered a reason for its action, all presumptions and special rules drop away; a case under Title VII becomes like any other case in that the plaintiff, in order to prevail, must have evidence from which

the factfinder can reasonably find the essential elements of the claim") (citing *Fisher*, 114 F.3d at 1336).

In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court also addressed the interplay of the prima facie case and a showing of pretext. The Court stated that the existence of evidence both establishing a prima facie case and showing that the employer's proffered explanation is pretextual is not necessarily sufficient, nor necessarily insufficient, to take the case to the jury. *Id.* at 146–48, 120 S.Ct. 2097. Instead, *Reeves* "mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir.2000) (quoting *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097). The relevant factors for a court to consider in making that determination include "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148–49, 120 S.Ct. 2097.

In *James*, the Second Circuit, after considering whether the rule adopted in *Fisher* had been overturned by the Supreme Court's decision in *Reeves*, concluded that "the Supreme Court's reasoning in *Reeves* is wholly compatible and harmonious with our reasoning in *Fisher*. There is no inconsistency between the two rulings." 233 F.3d at 155. The court stated that "both opinions essentially stand for the same propositions—(i) evidence satisfying the minimal *McDonnell Douglas* prima facie case, coupled with evidence of falsity of the

employer's explanation, may or may not be sufficient to sustain a finding of discrimination; (ii) once the employer has given an explanation, there is no arbitrary rule or presumption as to sufficiency; (iii) the way to tell whether a plaintiff's case is sufficient to sustain a verdict [and hence to bar summary judgment] is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination." *Id.* at 156–57. *See also Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376 (2d Cir.2001) ("The [court's] task ... is to examine the entire record and, in accordance with *Reeves*, make the case-specific assessment as to whether a finding of discrimination may reasonably be made").

On a motion for summary judgment, then, assuming that the plaintiff has made out a prima facie case, and the defendant has proffered a legitimate, nondiscriminatory reason for its actions, the court must examine the record as a whole, and determine whether the plaintiff has presented sufficient evidence from which the trier of fact could infer that the defendant discriminated against the plaintiff. Evidence suggesting that the defendant's proffered reason is false will certainly bear upon, but is not necessarily dispositive of, that issue.

## II. Tenure Decisions and Title VII— General Principles

While there can be no dispute that Title VII applies to colleges and universities no less than to other employers, *University of Pennsylvania v. EEOC*, 493 U.S. 182, 190–

91, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990); *Fisher v. Vassar College*, 70 F.3d 1420, 1435 (2d Cir.1995), *reh'g in banc*, 114 F.3d 1332 (2d Cir.1997), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998)[7], "[t]he Second Circuit has noted repeatedly that tenure decisions involve unique factors which set them apart from ordinary employment decisions, and federal courts should exercise caution in reviewing them." *Grant v. Cornell Univ.*, 87 F.Supp.2d 153, 157 (N.D.N.Y.2000) (citing *Fisher*, 70 F.3d at 1434–35; *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92 (2d Cir. 1984); *Lieberman v. Gant*, 630 F.2d 60, 64 (2d Cir.1980)). Partly this cautious approach reflects an awareness that tenure decisions "often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges," that are best "left for evaluation by the professionals...." *Kunda v. Muhlenberg College*, 621 F.2d 532, 548 (3d Cir.1980) (quoted in *Bickerstaff*, 196 F.3d at 455 n. 7); *see also Zahorik*, 729 F.2d at 93 ("Where the tenure file contains the conflicting views of specialized scholars, triers of fact cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion").

In addition to these practical considerations, courts are also understandably wary of impinging upon the academic freedom of our institutions of higher learning, an "important part" of which is a "university's prerogative 'to determine for itself on academic grounds who may teach'" within its classrooms and lecture halls.

---

**7.** The *in banc* rehearing in *Fisher* was limited to resolution of whether a finding of liability under Title VII, supported by a prima facie case and a sustainable finding of pretext, was subject to review for clear error. A majority of the court concluded that the panel was within its powers in conducting such a review, and thus effectively let the panel decision on the merits stand unaltered. *See* 114 F.3d at 1347 n. 11 (directing issuance of mandate "drawing its authority from the opinion of the in banc court as to the appropriateness of appellate review for clear error, and the panel's rulings as to the disposition of all other issues in the appeal").

*Lieberman,* 630 F.2d at 67. *See also Bickerstaff,* 196 F.3d at 455 (a college "alone has the right to set its own criteria for promotion and then to evaluate a candidate's fitness for promotion under them"). Therefore, "[w]hen a college or university denies tenure for a valid, non-discriminatory reason, and there is no evidence of discriminatory intent, this Court will not second-guess that decision." *Weinstock,* 224 F.3d at 43 (citing *Bickerstaff,* 196 F.3d at 455–56; *Fisher,* 114 F.3d at 1344–45). *See also Negussey v. Syracuse Univ.,* No. 95–CV–1827, 1997 WL 141679 (N.D.N.Y. 1997) ("This court does not sit as a super tenure-review committee").

At the same time, however, I remain mindful that "[t]enure decisions are not exempt under Title VII." *Zahorik,* 729 F.2d at 93; *see also Namenwirth v. Board of Regents,* 769 F.2d 1235, 1243 (7th Cir. 1985) ("faculty votes should not be permitted to camouflage discrimination"), *cert. denied,* 474 U.S. 1061, 106 S.Ct. 807, 88 L.Ed.2d 782 (1986). Judicial deference to university officials' tenure decisions, therefore, should not become a "policy of self-abnegation where colleges are concerned." *Powell v. Syracuse Univ.,* 580 F.2d 1150, 1153 (2d Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). In evaluating plaintiff's claims and defendant's motion, then, the court must strike a balance, giving proper deference to the informed, good-faith evaluations of faculty members by their peers, while at the same time leaving fully open the avenues of relief created by Congress for individuals who have been discriminated against in their employment.

### III. Plaintiff's Discrimination Claim

Applying these standards to plaintiff's claims, and viewing the record in the light most favorable to plaintiff, the nonmoving party, I conclude that she has failed to present sufficient evidence to give rise to a genuine issue of fact concerning whether she was discriminated against on account of her sex. Though plaintiff has presented some evidence that the standards for granting tenure were not as rigid as defendant now claims, there is no evidence that plaintiff's sex had anything to do with the decision to deny her tenure application.

 As a preliminary matter, I do find that plaintiff has made out a *prima facie* case. Two out of the five members of the APT Committee voted to recommend tenure for plaintiff, and even those faculty members and officials who recommended against tenure indicated that it was a close question. *See Zahorik,* 729 F.2d at 93–94 (in order to show that she was qualified for tenure, plaintiff must demonstrate that "[s]ome significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question"); *cf. Grant,* 87 F.Supp.2d at 158 (court was not convinced that plaintiff had made out prima facie case, despite defendant's apparent concession that he had, where it was "undisputed that *none* of the Departmental faculty believed plaintiff qualified for tenure"). Since defendant has proffered a legitimate, nondiscriminatory reason for denying tenure—plaintiff's inadequate scholarship—the court can turn to the ultimate question: whether the evidence gives rise to an issue of fact about whether sex discrimination was a motivating factor in defendant's decision.

 There are two main areas which plaintiff contends are in dispute. The first concerns the manner in which the APT Committee that reviewed plaintiff's tenure application was formed. Plaintiff asserts that, had the usual practices been followed, Evelyn Newlyn would at least have been on the ballot for the APT Committee, and possibly on the committee itself. Newlyn

testified that "usually everybody who volunteers is on the committee they volunteer for." Curran testified that he would have, or probably would have, put Newlyn's name on the ballot had she volunteered to serve on the APT Committee. There is evidence, though, that Newlyn did volunteer, and that she brought that fact, and her absence from the ballot, to Curran's attention.

There is evidence, then, from which a factfinder could conclude that Curran departed from his usual practice when formulating the APT Committee in the Summer of 1997, with the result that Newlyn was prevented from serving on, or having a chance to serve on, the committee that year. The Second Circuit has stated that " '[d]epartures from procedural regularity [during the tenure review process] ... can raise a question as to the good faith of the process where the departure may reasonably affect the decision.' " *Weinstock*, 224 F.3d at 45 (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir.1997)).

There are a number of weaknesses with this evidence, however. For one thing, even if Newlyn had been on the ballot, there is no assurance that she would have been elected to serve on the APT Committee. Thus, even assuming that one could find some impropriety or at least irregularity in the manner in which the committee members were chosen, it is questionable whether that could be found to have affected the final outcome. *See Weinstock*, 224 F.3d at 45 (noting that "[i]n this case, however, whatever irregularities existed did not affect the final decision to deny Weinstock tenure").

Compounding that problem is the fact that the APT Committee's vote was just one, preliminary step in the entire tenure review process. The final decision was made by President Yu, who was not bound by the committee's recommendation. In addition, there were two other, intermediate recommendations by Curran and by Dean McLean, whose conclusions were neither bound by those of the APT Committee, nor binding upon President Yu. There is no evidence, nor apparently any allegation, that President Yu or Dean McLean were themselves motivated by any discriminatory animus.

Furthermore, although it was Curran who allegedly kept Newlyn off the ballot, there is virtually no evidence that he was motivated to do so by any discriminatory attitudes toward women, or for that matter against plaintiff herself, for a discriminatory reason, or for any other reason. Plaintiff has presented no evidence that Curran ever made any negative or sexist comments about particular women, or women in general, or that he otherwise displayed any discriminatory attitudes in that regard.

Most of the evidence concerning Curran comes from Newlyn rather than plaintiff. Newlyn also testified about what she perceived to be discriminatory practices and attitudes within the English Department, but much of her testimony in that regard is short on specifics, and has little or no connection with Curran or the facts of this case.

For example, Newlyn, who described herself as a feminist, testified that shortly after she joined the faculty at Brockport, she persuaded the other female members of the English faculty to sit at the main table during department meetings, rather than in the chairs scattered around the periphery of the meeting room. Previously, the chairs at the table had been occupied solely by male faculty. While this might sound like a minor matter, she testified that "the men in the department were flabbergasted." Newlyn Depo. at 14.

Newlyn did not state when these events occurred, other than that this was following her first department meeting she attended at Brockport.[8] Curran, however, did not become the Department Chair until 1993, *see* Curran Aff. ¶ 2, and there is no evidence, apart from Newlyn's general reference to "the men in the department" being "flabbergasted," that Curran expressed any feelings at all about these events.

Newlyn also testified that at some point (she did not state exactly when) she "organized the other women" in the English Department to speak to Curran about what she perceived to be inequities in the manner in which discretionary salary increases ("DSIs") were being awarded in the department.[9] Newlyn and the other women contended that "the men were all at the top and the women at the bottom" with respect to the amount of the DSIs. Newlyn Depo. at 20. She testified that this meeting "accomplished nothing except, I think, to make [Curran] more angry at all of us than he already was." Newlyn Depo. at 20–21.

As for the DSIs themselves, plaintiff has presented no evidence, other than naked allegations, that there was in fact any gender-based inequity in the manner or amounts in which the DSIs were awarded. Defendants have submitted a chart showing English Department salary records, including DSIs, for the period 1990 to 2000. While different faculty members received different amounts in different years,

no discrepancies correlating to the sex of the recipients is apparent. *See* Curran Aff. Ex. X.

In addition, this testimony does not indicate that Curran displayed any animus toward women. Newlyn's conclusory statement that this meeting made Curran "more angry ... than he already was" contains no factual basis for Newlyn's perception that Curran was angry, or any details indicating that Curran's alleged anger somehow reflected discriminatory feelings toward women. Finally, it appears that Newlyn herself was the main player in this episode; there is no indication that Curran harbored any negative feelings toward plaintiff either during or as a result of this meeting.

Plaintiff appears to suggest that Curran, and other men in the English Department, were antagonistic toward her because of her feminist views. Again, however, this assertion finds little if any support in the evidence.

Plaintiff alleges that Curran "knew that [plaintiff] was a feminist by virtue of [her] work within Women's Studies." Plaintiff's Aff. ¶ 27. She offers no evidence, though, that Curran was prejudiced against her because of that. Newlyn, who also described herself as a feminist, stated that being a feminist at Brockport was akin to "being a bunny rabbit in the wolf cave. There aren't very many of us, and people don't like what we try to do, which is to make things equitable and fair." Newlyn Depo. at 27. She said that she and plain-

---

**8.** Curran states in his affirmation that Newlyn was appointed to a full time position at Brockport in 1989, although initially she had limited responsibilities in the English Department, because she had significant assignments in the Women's Studies Program at Brockport. Curran Aff. ¶ 12.

**9.** According to Curran's affirmation, which is uncontradicted in this regard, DSIs are

awarded when funds are provided in the state budget for rewarding faculty for exceptional productivity in the areas of teaching, service, or scholarship. Nominations are reviewed by the APT Committee, department chairperson, and the dean. Curran Aff. ¶ 87. Curran does not state who actually makes the final decision whether, or in what amount, to award DSIs.

tiff "were not part of the male circle of power" within the English Department, and that the men in the department tended to make decisions among themselves "when they went out to dinner or stood in the men's room or who knows where." Newlyn Depo. at 16–17.

These vague allegations are not supported by any concrete facts, though, and there is nothing to show Curran's place within the "male circle of power," or any nexus between that alleged circle and the decision to deny plaintiff's tenure application. *See Wado v. Xerox Corp.,* 991 F.Supp. 174, 204 (W.D.N.Y.1998), *aff'd,* 196 F.3d 358 (2d Cir.1999) (noting that female plaintiff "ha[d] not articulated what it means to bear the 'brunt' of a 'male dominated work place' "). Even assuming that a jury could infer that the men in the department tended to socialize with each other, and that during that socializing they may have discussed or formed opinions about matters relating to affairs within the English Department, I do not believe that this evidence supports an inference that either Curran's actions with respect to the APT Committee, or any of the recommendations or the final decision not to grant plaintiff tenure, were the product of sex discrimination.[10]

Nor does plaintiff appear to allege that the APT Committee members who voted against her (one of whom was a woman) were biased against women. Newlyn did testify about one occasion when Mark Anderson, a member of the English faculty, "made some comments to the effect that he wouldn't mind being in [plaintiff's] bed.... And Stan Rubin said, 'Well, it's

not too late,' and this—this was very unpleasant for Mara. I was there." Newlyn Depo. at 25.

There is no allegation or evidence that Anderson was in any way involved in the decision to deny plaintiff tenure. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (statements or actions by nondecisionmakers, or actions unrelated to decisionmaking process, cannot support allegation of pretext) (O'Connor, J., concurring); *Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86, 97 (1st Cir.1996). Rubin was on the APT Committee that considered plaintiff's tenure application, but he voted *in favor of* plaintiff's application. Rubin Depo. at 51.

In short, though plaintiff's papers are rife with allegations of sex discrimination within the English Department, those allegations for the most part are not supported by the facts. To the extent that plaintiff has presented specific factual evidence in this regard, that evidence has no connection with the decisions, or decisionmakers, at issue in this case.

■ The second major area with respect to which plaintiff contends that there are disputed facts concerns the standards for tenure eligibility at Brockport, and specifically within the English Department. Plaintiff asserts that those standards were more amorphous, and less rigid, than defendant claims.

Defendant contends that "[i]t was absolutely essential that an applicant for tenure have a certain number of peer reviewed

---

**10.** Newlyn also testified that at one point (she did not state the year) she herself had been denied for promotion, which she attributed to "anti-feminist bias" on the part of the then-president of Brockport, John Van de Wetering. Newlyn Depo. at 27. Van de Wetering, however, was not involved in any of the deci-

sions or actions at issue in the instant case. Furthermore, Newlyn's further testimony about this matter indicated that she believed that Van de Wetering held a grudge against Newlyn because she had refused to let Van de Wetering's wife teach a women's studies course at Brockport. Newlyn Depo. at 27.

publications to be granted tenure," and that in the English Department, it was "expected that a successful candidate for tenure would have published at least three articles or the equivalent in national peer reviewed journals." Defendant's Statement Pursuant to Rule 56 (Docket Item 24) ¶¶ 35, 36.

Plaintiff, however, states in her affidavit that she was told only that she needed to publish "three works" in order to be granted tenure, and that she was never told that those works had to be in peer-reviewed or "refereed" journals. Plaintiff's Aff. ¶ 5. Plaintiff asserts that "[t]hroughout [her] employment with SUNY Brockport, there were never any specific criteria developed and disseminated setting forth the expectations of the Department of English as to the nature and quantity of scholarly works that were expected for consideration of Tenure application." Plaintiff's Aff. ¶ 7. Plaintiff asserts that she did meet the requirement (as she understood it) of having at least three published works, since she had, in addition to her one peer-reviewed article, published a number of book reviews, as well as entries and other material in the *Bloomsbury Guide to Women Writers.*

Defendant does not appear to dispute that the three-article requirement was never expressly set forth in any contemporaneous document. Dean McLean testified that the publication requirement "was sort of unwritten," that "the number was approximately three," and that "it would be nice to have it all written down," but that the exact requirements were not set out in writing. McLean Depo. (Attachment to Docket Item 29) at 44–45.

As noted earlier, however, there were written "Guidelines for Promotion" and "Guidelines for Continuing Appointment" in effect throughout the time of plaintiff's employment at Brockport. Those guide-

lines do not state that publication of any specific number of articles in peer-reviewed journals is a prerequisite for tenure, but they do state that a candidate's "publications" are one component of her "scholarly ability," which in turn is one of the criteria considered for continuing appointment. Plaintiff testified that she understood that "publications" referred to works published "in professional journals or by a professional publisher," which "[m]ost likely" meant peer-reviewed journals. Plaintiff's Depo. at 96.

Viewed in the light most favorable to plaintiff, this evidence suggests that there was no hard-and-fast requirement that a candidate for tenure had to have published at least three articles in peer-reviewed journals, or at least that plaintiff had not been explicitly informed of such a requirement. I do not believe that this presents a genuine issue of material fact, however. The record shows that the persons involved in the decision to deny plaintiff tenure—the members of the APT Committee, Curran, McLean and President Yu— did not state that they were basing their decisions or recommendations simply on the fact that plaintiff had not published three scholarly articles. Rather, they concluded, based on an assessment of her overall activity and productivity in the area of published scholarship, that plaintiff's performance in that area was not adequate, and did not show signs of improving anytime soon. The record does not reveal some formulaic, mechanical application of a three-publication rule that had never before been mentioned, but a reasoned *judgment* that plaintiff had not demonstrated the potential for appointment to the next rank. That is precisely the type of judgment to which a court should give deference.

Furthermore, regardless of how clear, or unclear, the standards may have been,

there is simply no evidence that plaintiff's sex was a factor. What this case really boils down to is a dispute over whether the tenure decision at issue was fair or correct, not whether it was discriminatory.

■ . This is further evidenced by plaintiff's contentions concerning the impact on her tenure eligibility of her course load and committee assignments. Plaintiff contends that for much of the time she taught at Brockport, her course and student loads were heavier than many other faculty members', and that she was encouraged to, and did, serve on various English Department committees. Plaintiff asserts that these responsibilities and commitments interfered with her ability to complete articles for publication, but that she had been led to believe that strength in these two areas could at least partially offset her relative lack of publication.

The APT Committee itself "recognized that bind that the untenured faculty may find themselves in at Brockport," by being sent "mixed signals" about the relative importance of service and scholarship. The committee also "recognize[d] the important contribution that Dr. McFadden has made in teaching." Based on plaintiff's annual reports, however, the committee concluded that plaintiff had been "keenly aware of the importance of published scholarship," and that she and her department chairpersons "encouraged it, expected it, and promised it." Curran Aff. Ex. S.

Curran also recognized plaintiff's achievements in the areas of teaching and service. In his recommendation to President Yu, Curran stated that plaintiff "has certainly exceeded college expectations in teaching." He noted that in the service category, plaintiff had "participated in a variety of departmental and college-wide capacities over the last six years," and that "[s]ince 1995, there ha[d] been some reduc-

tion in activity owing to the workload increase in teaching...." Curran Aff.Ex. U. Like the APT Committee, however, Curran stated that he did not see a potential for plaintiff's promotion, based on her dearth of publication.

Though this evidence indicates that it could have, and perhaps should have, been more clearly explained to untenured faculty members exactly what was expected of them if they hoped to be granted tenure someday, nothing about the evidence suggests that the reasons given for the decision to deny tenure to plaintiff were a smokescreen for unlawful discrimination. Plaintiff may believe that more weight should have been given to her teaching and service, or that her publication record was not as meager as defendant claims, but those arguments amount to disputes not about whether plaintiff was discriminated against, but about whether the determination that she was not deserving of tenure was sound.

It is important to reemphasize that the court's task is not to decide whether plaintiff *deserved* to be granted tenure, or whether it was a good or a bad decision to deny her tenure. Although tenure decisions are not shielded from judicial review, and courts will not turn a blind eye to discrimination merely because it takes place within the confines of a university, neither is it the function of the court to substitute its own judgment, or that of a jury, for the judgment of the appropriate university officials when it comes to evaluating a tenure candidate's qualifications.

■ I also note that plaintiff asserts that some male members of the English Department were granted tenure despite having fewer qualifications than she. For example, Curran himself never reached a rank higher than that of Assistant Professor, and his highest academic degree was a

Master of Arts degree. Curran Aff.Ex. A. Newlyn opined that Curran had not done any scholarship at all, Newlyn Depo. at 12, though his resumé reflects that he has had four articles published between 1981 and 1992. *Id.*[11]

Plaintiff also notes that Stanley Rubin was not promoted to the highest rank in the department until after he had remained at his prior rank for nineteen years, Rubin Depo. at 48.[12] Plaintiff contends that these examples belie defendant's contention that a candidate for tenure needed to have three peer-reviewed published works, and also demonstrate the potential for advancement to the next highest rank, or to the highest rank in the department, in order to be eligible for tenure.

"When plaintiffs seek to draw inferences of discrimination by showing that they were 'similarly situated in all material respects' to the individuals to whom they compare themselves, their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 101 (2d Cir.2001) (quoting *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997)). "What is key is that they be similar in significant respects." *Id.*

The Second Circuit has also stated that "to satisfy *Shumway's* 'all material respects' standard for being similarly situated, a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards." *Graham v. Long Island R.R.,*

230 F.3d 34, 40 (2d Cir.2000). "In other words, there should be an 'objectively identifiable basis for comparability.'" *Id.* (quoting *Cherry v. American Tel. & Tel. Co.,* 47 F.3d 225, 229 (7th Cir.1995)).

While there are some obvious, broad similarities between plaintiff and Curran and Rubin (such as being faculty members in the English Department), I do not believe that there is enough basis for comparison to create a genuine issue of fact with respect to whether plaintiff was discriminated against. I recognize that whether two employees are similarly situated often presents a question of fact for the jury, *Graham,* 230 F.3d at 39, but only if there is sufficient evidence from which a jury could reach that conclusion. *See Lizardo,* 270 F.3d at 101 (affirming summary judgment for defendants in race discrimination action, and stating that district court correctly concluded that plaintiffs had failed to show that certain white patrons, who plaintiffs alleged had been treated more favorably than they, were similarly situated to plaintiffs).

In the case at bar, Curran was granted tenure in 1970, twenty-seven years before plaintiff's application was considered. Defendant states, and plaintiff does not dispute, that none of the persons who considered Curran's application for tenure were involved in plaintiff's tenure application. Plaintiff has also submitted no evidence to contradict Meade's statement in his affirmation that the standards for tenure were much different, with much less emphasis placed on scholarship, at the time when Curran was granted tenure, from those in

**11.** Newlyn also testified that Mark Anderson, who was tenured, "had done some tiny little bits and pieces [of scholarship], nothing substantial." Newlyn Depo. at 12. There does not appear to be any evidence in the record supporting this assertion, however.

**12.** Plaintiff also alleges, but has not submitted evidence, that another male, Earl Ingersoll, remained in rank for 17 years before being promoted. Rubin was asked about this at his deposition, but stated that he did not remember how many years Ingersoll remained in rank. Rubin Depo. at 9.

effect in the 1990s. *See* Meade Aff. ¶ 9. Given the remoteness in time between these tenure decisions, the absence of any decisionmakers common to both, and the different standards in effect in 1970, I find that there is insufficient evidence to submit to a jury the issue of whether Curran was similarly situated to plaintiff.

I also find that the nineteen-year period in which Rubin remained at rank before being promoted does not give rise to a genuine issue of material fact. The problem with plaintiff's application, as expressed by her colleagues who considered the application, was not simply a matter of how long she was expected to remain at the same rank. The problem was her scholarship and lack of publication, which did not seem likely to improve anytime soon. There is no evidence that Rubin's qualifications in that regard were similar to plaintiff's. Plaintiff has simply not presented evidence to show that Rubin was "similarly situated in all material respects" to plaintiff with respect to his eligibility for tenure. *Shumway*, 118 F.3d at 64.

## IV. Plaintiff's Retaliation Claim

■ Plaintiff also alleges that defendant retaliated against her for having opposed the alleged sex discrimination at issue in this case. Plaintiff alleges that this retaliation was prompted both by her attorney's contacting Brockport in January 1998, requesting defendant to investigate plaintiff's allegations of sex discrimination, and by plaintiff's filing of a charge with the EEOC in April 1998.

Specifically, plaintiff alleges that the final decision by President Yu to deny her tenure was motivated not only by discrimination, but by a desire to retaliate against plaintiff for having opposed discrimination. Plaintiff also alleges that Curran failed to provide her with a letter of recommendation, which he promised to give her after

President Yu notified plaintiff of her termination. Plaintiff further contends that in her annual review that Curran provided plaintiff on June 3, 1998, he deliberately neglected to mention, or gave minimal weight to, many of plaintiff's accomplishments during the review period, which also impaired plaintiff's chances of obtaining another teaching position after she left Brockport. She also states that after learning of plaintiff's claims of discrimination, Curran placed on hold an order for a computer that plaintiff was supposed to receive, and which she needed for the efficient performance of her duties for the remainder of her employment at Brockport.

Title VII makes it unlawful for "an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To make a claim for retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) adverse employment action; and (4) a causal connection between plaintiff's protected activity and the adverse employment action." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 113 (2d Cir.2000). A causal connection can be established directly through evidence of retaliatory animus or "indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct." *Id.*, at 117; *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991).

In the case at bar, defendant concedes that the first three elements of a retalia-

tion claim are met. Plaintiff engaged in a protected activity both by filing the EEOC charge in April 1998, and also by sending a letter, through her attorney, to President Yu informing him of plaintiff's allegations of sex discrimination, and requesting "a formal review and investigation of the [APT] committee's decision to deny [plaintiff] tenure." Meade Aff.Ex. R. Although defendant contends that Brockport was not served with a copy of the EEOC complaint until May 6, 1998, two days after President Yu informed plaintiff that her employment was being terminated, defendant concedes that it was aware of the letter from plaintiff's attorney in January 1998. Defendant also concedes that it took adverse action against plaintiff by denying her tenure.

Defendant does dispute the fourth element of a retaliation claim: a causal connection between the protected activity and the adverse action. Defendant notes that President Yu's decision was consistent with the recommendations of the APT Committee and Curran, which predated plaintiff's attorney's letter.

I agree with defendant that the decision by President Yu in May 1998 to deny plaintiff's tenure application cannot supply the fourth element of plaintiff's prima facie case. On the evidence presented, there is no reason to think that President Yu would have made a different decision had he not received the letter from plaintiff's attorney. By the time Yu made his decision, the APT Committee, Curran and McLean, had all recommended that he deny plaintiff's application. He simply accepted that recommendation. To find that this evidence supports a claim for retaliation would effectively eliminate the fourth element of a retaliation claim, to require only participation in protected activity of which the defendant was aware, followed by some adverse action. An employee who

knows that some adverse action is in the works cannot manufacture a claim for retaliation, based solely on the anticipated adverse action itself, merely by complaining of discrimination before the action is finally taken. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (holding that plaintiff failed to establish causation on her claim of retaliatory transfer, Court observed that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality").

■ Plaintiff also alleges that Curran retaliated against her by failing to give her a letter of reference, which he allegedly promised to do after plaintiff had been informed of her termination. There is authority that a refusal to give an employee a letter of reference can constitute an adverse action for purposes of establishing a retaliation claim. *See, e.g., Pantchenko v. C.B. Dolge Co.,* 581 F.2d 1052, 1055 (2d Cir.1978) (per curiam); *E.E.O.C. v. L.B. Foster Co.,* 123 F.3d 746, 754–55 (3d Cir. 1997), *cert. denied,* 522 U.S. 1147, 118 S.Ct. 1163, 140 L.Ed.2d 174 (1998); *Hawkins v. Astor Home for Children,* No. 96 CIV. 8778, 1998 WL 142134 *10 (S.D.N.Y. Mar. 25, 1998).

Plaintiff does not, however, allege that Curran promised to give her a letter of reference, then reneged *after* learning that plaintiff had complained of discrimination. *Cf. Hawkins,* 1998 WL 142134 *10 (former supervisor promised to give plaintiff letter of reference, but then would not respond to plaintiff's requests for such letter after plaintiff filed EEOC complaint). Curran allegedly made the promise after plaintiff had already been informed by President Yu that her appointment was being termi-

nated, *see* Complaint ¶ 35, which was months after plaintiff had first raised her claims of discrimination in connection with the APT Committee's recommendation. Had Curran harbored retaliatory motives, it is hard to see why he would have made the promise in the first place.

Nor is this a case in which the employer had a regular policy of providing letters of reference, but refused to give one to a particular employee who had complained about discrimination. *Cf. L.B. Foster,* 123 F.3d at 754 (noting evidence that employer had given telephone references as a matter of course to prospective employers when they called about former employees, until a prospective employer sought one for employee on whose behalf EEOC brought suit, who had told employer that she intended to file sex discrimination claim against employer); *see also Rutherford v. American Bank of Commerce,* 565 F.2d 1162, 1164 (10th Cir.1977) (before plaintiff filed sex discrimination charge, defendant bank's vice president had given her a glowing letter of recommendation, but after plaintiff filed sex discrimination charge against the bank, same vice president conceded that he was "not pleased" at all by such filing, and when called by another Bank concerning plaintiff's employment record, volunteered that plaintiff had filed discrimination charges against the bank).

Moreover, plaintiff has not alleged what, if any, steps she took to obtain the promised letter of reference. She states only that she never received such a letter from Curran. *See* Complaint ¶ 35; Plaintiff's Aff. ¶ 42. Given these sparse factual allegations, I am not prepared at the summary judgment stage to fill in the gaps for plaintiff and assume that there is evidence indicating that Curran consciously declined to provide plaintiff with a letter of reference, and that he was motivated to do so by a desire to retaliate against plaintiff because she had engaged in protected activity.[13]

■ Plaintiff's allegations concerning her June 1998 performance review likewise fail to support a claim of retaliation. Plaintiff has not pointed to any specific facts showing that this review was objectively inaccurate or that Curran deliberately downplayed her achievements. Curran was not obligated to give plaintiff a glowing review; he had only to give her an honest one. Plaintiff's expression of her subjective belief that she deserved a more laudatory review than she got fails to make out a claim of retaliation. *Wado,* 991 F.Supp. at 190 ("an employee's subjective belief that her employer's assessment of her is unjustified is insufficient to give rise to an inference of discrimination"). In addition, is it doubtful whether this amounts to an adverse action sufficient to make out a prima facie case of retaliation. *See Richardson v. New York State Dep't of Correctional Service,* 180 F.3d 426, 443–44 (2d Cir.1999) (plaintiff's "conclusory allegation that she deserved an excellent, rather than an average, performance rating is insufficient to establish that the evaluations constitute adverse or disadvantageous actions" by her employer); *Smart v. Ball State Univ.,* 89 F.3d 437, 442–43 (7th Cir.1996) (finding that plaintiff's negative job evaluations alone did not constitute adverse employment action for purposes of retaliation prima facie case).

---

**13.** I do not mean to suggest that Curran must have expressly told plaintiff that he would not provide her with the previously promised letter. The point is that plaintiff has not alleged, or provided evidence, that she ever even *asked* for such a letter. Based on the record before me, then, there is simply no basis upon which a factfinder could determine whether Curran's failure to provide plaintiff with such a letter was due to retaliation, forgetfulness, or his expectation that plaintiff would ask him for such a letter if and when she needed one.

Finally, plaintiff's allegation about Curran's placing the order for a computer on hold does not support a claim for retaliation. "An adverse employment action is a 'materially adverse change in the terms and conditions of employment.'" *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 85 (2d Cir.2001) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000)). I do not believe that the inconvenience occasioned by not receiving a new computer rises to that level. *See Enowmbitang v. Seagate Technology, Inc.*, 148 F.3d 970, 973 (8th Cir.1998) ("Seagate's failure to provide Enowmbitang a computer does not rise above a 'mere inconvenience' and therefore does not constitute an adverse employment action") (quoting *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir.1997)); *Wanamaker*, 108 F.3d at 462 (loss of a phone and office is not sufficiently deleterious to constitute adverse employment action supporting retaliation claim); *Jacklyn v. Schering–Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 930 (6th Cir. 1999) ("As the district court found, neither requiring plaintiff to work at home while she was recovering from out-patient surgery, nor rejecting computer expenses that previously had been approved, were materially adverse employment actions").

## CONCLUSION

Defendant's motion for summary judgment (Docket Item 17) is granted, and the complaint is dismissed.

IT IS SO ORDERED.